No. 16-2690

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JILL STEIN and LOUIS NOVAK,

     Plaintiffs-Appellees,

v.

CHRISTOPHER THOMAS, in his official capacity as Director of
Elections; and JEANETTE BRADSHAW, NORMAN D. SHINKLE,
JULIE MATUZAK, and COLLEEN PERO, in their Official Capacities
as Members of the Board of Canvassers,

     Defendants-Appellants.

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Mark A. Goldsmith

**EMERGENCY MOTION FOR STAY ON BEHALF OF
INTERVENING DEFENDANT ATTORNEY GENERAL
BILL SCHUETTE**

**ACTION REQUIRED BY 5:00 P.M. TUESDAY,
DECEMBER 6, 2017**

Bill Schuette
Michigan Attorney General

Matthew Schneider (P62190)
Chief Legal Counsel
Counsel of Record

John J. Bursch (P57679)
Special Assistant Attorney
General

BURSCH LAW PLLC
9339 Cherry Valley Ave SE, #78
Caledonia, MI 49316
(616) 450-4235

Kathryn M. Dalzell (P78648)
Assistant Solicitor General
Attorneys for Plaintiff
P.O. Box 30212
Lansing, MI 48909
(517) 373-1124

Dated:  December 6, 2016

# TABLE OF CONTENTS

Page

Introduction................................................................................3

Argument....................................................................................5

I.    The Attorney General is likely to prevail on the merits of his
      appeal of the temporary restraining order. ...................................6

      A.    A stay is required to clarify that the district court does
            not retain continuing jurisdiction over the recount
            process. ...................................................................6

      B.    The request for a temporary restraining order is barred
            by the doctrine of laches..........................................7

            1.    Plaintiffs should have raised their concerns with
                  Michigan's electoral machinery long before the
                  2016 election...................................................9

            2.    Plaintiffs should have petitioned for a recount
                  weeks ago. ....................................................14

            3.    Michigan's voters and taxpayers are prejudiced
                  by Stein's inexcusable delay. ...........................15

      C.    Abstention is required under *Burford*. .................................20

      D.    Michigan Compiled Laws 168.882(3) is constitutional. .......21

      E.    Plaintiffs' are not constitutionally entitled to a recount.......22

II.   The People of the State of Michigan will be irreparably
      harmed absent a stay.................................................................23

III.  Plaintiffs will not suffer irreparable harm if a stay is
      granted. ....................................................................................24

IV.   The public interest in a stay is strong. .........................................25

Conclusion and Relief Requested........................................................26

Certificate of Service ......................................................................28

## INTRODUCTION

Green Party candidate Jill Stein—who received approximately *1%* of the nearly 4.8 million votes cast in Michigan for president of the United States—filed an 11th-hour petition for recount that will cost Michigan taxpayers millions of dollars and that threatens to deprive Michigan citizens of their voice in the Electoral College.  Stein has zero chance of winning Michigan's electoral votes; she cited no evidence of fraud or mistake in the canvass of votes; and she has offered no argument as to how she is aggrieved by the electoral counts.  Despite these facts, Stein asked for an immensely costly statewide recount, to be conducted by hand.  And while Stein could have raised her objection to the purported vulnerability of Michigan's election machinery well before the 2016 election, and could have requested a statewide recount weeks ago, she unjustifiably delayed raising her concerns until three weeks *after* the election, and *less than two weeks before the federal safe harbor deadline* for resolving disputes over Michigan's electors.

Stein's inexcusable delay prejudices Michigan taxpayers and voters, who will now have to subsidize a far more expensive process to

address Stein's concerns, and her delay risks Michigan's voice in the electoral college as well.

While Plaintiffs requested very limited relief below in the district court—a ruling that Michigan Compiled Laws 168.882(3), which imposes a two-day waiting period to allow for judicial review of decisions by the Board of State Canvassers on recount petitions, is unconstitutional as applied to them—the district court's order could be misconstrued as retaining continuing jurisdiction over the entire extent of the recount process. Specifically, the district court not only issued an order enjoining enforcement of Michigan's statutory two-day waiting period, it also instructed that "the recount shall commence and *must continue until further order of this Court*." (Dist. Ct. 2:16-cv-14233, R.16, Page ID #678.)

An immediate stay of the district court's order is necessary. Not only did the court err on the law, Plaintiff Jill Stein has already sought to use the court's order as a sword in the state courts, arguing that the state courts are precluded under the Supremacy Clause from deciding issues of state law currently pending before those courts. This Court's immediate intervention is necessary to ensure that the state courts are

4

not thwarted in their duty to decide the important state law issues presented, including, among others, who constitutes an "aggrieved" party entitled to a recount under state law.

Given the nature of the district court's order, that moving for a stay first in the district court would be impracticable and futile, and the limited time frame for review, the Attorney General has not sought a stay first in the district court.  Fed. R. Civ. P. 8(a)(2)(A)(i).

## ARGUMENT

In *Coalition to Defend Affirmative Action v. Granholm*, this Court set out the familiar standard for a stay pending appeal:

> [W]e consider "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." All four factors are not prerequisites but are interconnected considerations that must be balanced together.

473 F.3d 237, 244 (6th Cir. 2006) (citations omitted).  Each factor of this test supports an emergency stay.  The district court's interference with valid and constitutional state election law must be stayed to ensure that these substantial issues of state law may be heard in the state courts before subjecting Michigan taxpayers to irreparable harm.

I.    **The Attorney General is likely to prevail on the merits of his appeal of the temporary restraining order.**

A.    **A stay is required to clarify that the district court does not retain continuing jurisdiction over the recount process.**

Despite that Plaintiffs requested very limited relief—a ruling that the two-day window of time for judicial review in Michigan Compiled Laws 168.882(3) is unconstitutional as applied to them—the district court's order could be misconstrued to retain continuing jurisdiction over the entire extent of the recount process.  Specifically, the district court not only issued an order enjoining enforcement of Michigan's statutory two-day waiting period, it also instructed that "the recount shall commence and *must continue until further order of this Court*." (Dist. Ct. 2:16-cv-14233, R.16, Page ID #678.)

While the district court clearly contemplated that the recount could be halted at a later date, despite its order, *see id.* Page ID #679 n.2, Plaintiff Jill Stein has already sought to use the district court's order in the state courts, arguing that under the Supremacy Clause, the Michigan courts are now precluded from deciding state law questions currently pending before those courts.  Such a decision extends beyond any relief Plaintiffs sought in their federal court complaint, and this

6

Court must intervene and issue a stay so that there is no confusion that the Michigan courts may move forward in their timely resolution of purely state-law claims.

### B.   The request for a temporary restraining order is barred by the doctrine of laches.

This Court has repeatedly recognized that in election cases a plaintiff must expeditiously press his case, and Plaintiffs have not done so here.

Indeed, just recently this Court held that a voter's unreasonable delay in filing suit warranted a stay of the district court's preliminary injunction. As the Court stated, "[t]iming is everything." *Crookston v. Johnson*, 841 F.3d 396 (6th Cir. 2016) (declining to accept the plaintiff's "invitation to suddenly alter Michigan's venerable voting protocols, especially when he could have filed this lawsuit long ago"); see also *Nader v. Blackwell*, 230 F.3d 833, 835 (6th Cir. 2000) ("The plaintiffs could have pursued their cause more rigorously by filing suit at an earlier date. A state's interest in proceeding with an election increases as time passes, decisions are made, and money is spent."); *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (applying laches to a 3.5-week

delay by a candidate who knew of his injury but failed to expeditiously "press his case").  "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it."  *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007).

Plaintiffs' claims are barred by the doctrine of laches for at least two independent reasons:  (1) Stein had access to all of the information necessary to bring her objection to the purported vulnerability of Michigan's election machinery well before the 2016 election, yet she unjustifiably delayed raising her concerns until three weeks *after* the election, and *less than two weeks before the federal safe harbor deadline* for resolving disputes over Michigan's electors; and (2) Stein also had access to all of the information necessary to seek a recount weeks ago under state law, yet she inexplicably delayed filing her petition until—again—three weeks after the election and shortly before the federal safe harbor deadline.

1.    **Plaintiffs should have raised their concerns with Michigan's electoral machinery long before the 2016 election.**

Stein had all the information she needed *years ago* to raise her unsupported and unsubstantiated concerns about the vulnerability of Michigan's election machinery, yet she raised her constitutional claims challenging that machinery *not* years ago, *not* months ago, *not* even immediately after the election, but rather *four weeks after the election, only 10 days before Michigan must resolve any disputes over its electors to retain control over those electors in the federal electoral system.* Accordingly, Stein's claim is barred by laches.

To support her argument that Michigan's election machinery is vulnerable to tampering, Stein and her experts overwhelmingly cite sources from *years before* the 2016 election. See affidavits of seven experts filed in support of Dr. Stein's motion for a temporary restraining order in *Stein v Thomas*, No. 16-cv-14233 (ED Mich Dec 2, 2016); see, e.g., Ex. 10, ¶ 4 (Affidavit of Douglas Jones, touting research project on reliable and auditable elections *conducted from 2005 to 2011*, service on U.S. Election Assistance Commission's Technical Guidelines Development Committee from *2009 to 2012*, and writing book *Broken*

*Ballots* in *2012*); *id.* ¶ 10 (citing optical scanner research in Florida in *year 2000*); *id.* ¶ 20–21 (citing ballot software research from *2004 and 2006*); Ex. 11, ¶ 1 (Affidavit of Harri Hursti, citing tests of Diebold Election Systems voting machines *developed in 2005*); *id.* ¶ 3 (citing *2007 report* on "the models of voting machines and other election infrastructure" that Michigan uses); Ex. 12, ¶ 10 (Affidavit of Alex Halderman, noting that he and other experts "have repeatedly documented in peer-reviewed and state-sponsored research studies[ that] American voting machines have serious cybersecurity problems"); *id.* ¶ 11 n.2 (citing *2014* Stuxnet virus used to sabotage Iran's nuclear program); *id.* ¶ 12 (noting that "the vulnerabilities of American voting machines *ha[s] been known for some time*" (emphasis added)); *id.* ¶¶ 14–16 (citing *2007 studies* on security of styles of machines used in Michigan); Ex. 13, ¶¶ 29–30 (Affidavit of Philip Stark, citing optical scanning errors he observed in *2008* and *2011*); Ex. 14, ¶ 5 (Affidavit of Poorvi Vora, citing voting technology developed in *2009* and *2011*); *id.* ¶ 25 (citing a *2011 study* on a voting machine used in Michigan); Plf.'s TRO Br., p 10–11 (citing Richard Clarke comments from August of this year).

Indeed, Stein concedes that "the vulnerability of American voting machines have been known for some time[.]" Plf.'s TRO Br., p 12. If that is true, Stein could have challenged Michigan's voting system well in advance of the 2016 election, if her objective really were to ensure the integrity of the election. Had Stein raised a timely challenge, the State could have had time to offer a thorough, researched response and address Stein's concerns.

An example of a measure that could have been implemented *before* the 2016 election—had Stein cared to raise it then—is a procedure for "risk-limiting audits." Multiple of Stein's experts tout these audits as a reliable way of ensuring the correctness of the election results; one of her experts touts it as "the gold standard." Ex. 13 (Affidavit of Philip Stark), ¶ 10; see also Ex. 9, ¶ 15 (Affidavit of Dan Wallach, citing "risk-limiting audits" put in place in select states *years ago*, and explaining that "by selecting a small number of ballots at random and then comparing the physical paper ballot with its electronic analogue, we can reach a very high degree of statistical confidence in the correctness of the election outcome"); *id.* (arguing that full paper recount is necessary *now that there is no longer enough time to*

11

*implement an audit procedure*); Ex. 14 (Affidavit of Poorvi Vora), ¶ 29; Ex. 15 (Affidavit of Ronald Rivest), ¶ 23. Such an audit would costs millions less than conducting a *state-wide*, *manual recount* that requires thousands of state and county employees to perform and supervise a visual inspection of the more than 4.8 million votes case in the 2016 Michigan Presidential election. See Ex. 15 (Rivest Affidavit), ¶ 23 (noting that reliable audits are "quite cheap"). But instead of raising her concerns with Michigan's voting system in a timely fashion, Stein waited until *three weeks after* the election, and less than *two weeks* before the federal "safe harbor" deadline.

It is also concerning that Stein has been selective in her purported quest to ensure election integrity. Over 100 Green Party members have signed a petition denouncing Stein's recount efforts, noting that "the states chosen for the recount are only states in which Hillary Clinton lost." As the statement notes, "[t]here were close races in other states such as New Hampshire and Minnesota where Clinton won, but which were not part of the recount."[1] The letter urged Stein to take greater

---

[1] According to the LA Times, much of New Hampshire "uses optical scan machines to tally the paper ballots, machines in use since 1992 that have needed little maintenance[.]" Michael Memoli, *New*

care to distance the Green Party "from any appearance of support for either Democrats or Republicans." Margaret Flowers, *Greens Speak Out on Recount and Our Commitment to an Independent Party*, Flowers for Senate (Nov. 28, 2016), available at http://www.flowersforsenate.org/greens_speak_out_recount (last visited Dec. 4, 2016). In other words, it appears Stein is not so focused on election integrity, only in examining votes cast in states that Clinton narrowly lost.

In support of her allegation that Michigan's machines are allegedly vulnerable to hacking, Stein's experts cite studies from years ago. Yet Stein inexplicably waited until this moment—10 days before the federal safe harbor deadline for resolving disputes over Michigan's electors—to raise these constitutional claims. If Stein was actually concerned about the vulnerability of state election machinery, she should have (and would have) brought this suit well in advance of the 2016 election, and in every state in which it is an issue—instead of

---

*Hampshire relies on a mix of new and old voting systems*, (Feb. 9, 2016), available at http://www.latimes.com/politics/la-na-voting-new-hamphire-style--20160209-story.html (last visited Dec. 4, 2016). And according to Verified Voting, Minnesota uses optical scan machines. See Verified Voting, *The Verifier – Polling Place Equipment in Minnesota – 2016*, available at https://www.verifiedvoting.org/verifier/#year/2016/state/27 (last visited Dec. 4, 2016).

almost four weeks after the election, and selectively in only states that candidate Hillary Clinton narrowly lost.

### 2. Plaintiffs should have petitioned for a recount weeks ago.

Stein also delayed inexcusably in petitioning for a recount under state law.  While Stein could have requested a recount immediately after polls closed on November 9th, she waited until the last possible moment under state law—the afternoon of November 30th, nearly three weeks later—to file her recount petition.

Michigan Compiled Laws § 168.879(1)(c), which sets the deadline for filing a petition for recount, does not preclude a candidate from filing the petition before the canvass of votes is completed.  *Santia v. Bd. of State Canvassers*, 391 N.W.2d 504, 505 (Mich. App. 1986) ("We find that the statute on its face sets only an outside time limit upon which the recount petition may be filed.").  If Stein desired to trigger an orderly and timely recount that could be completed consistently with state and federal law—and not a rushed, disorderly, and more expensive recount that threatens Michigan's vote in the federal electoral system—she should have filed her petition long ago, as early as the close of polls on

14

November 9, 2016, and certainly more than the drop-dead deadline of "48 hours following the completion of the canvass of votes." Mich. Comp. Laws § 168.879(1)(c).

While Stein has argued in the state courts that she could not possibly have requested a recount sooner because she lacked a list of the precincts in which her recount would be required, she is mistaken. First, Stein requested a *state-wide* recount; thus, the precincts in which her recount will be required are "all of them." Second, it is difficult to believe that Stein was truly unable to obtain, from any source (e.g., the Secretary of State's office), a list of Michigan's counties, cities, townships, and precincts. This information is not secret, and that data would be available, at the very least, from Michigan's numerous elections past. Stein was not somehow prevented from obtaining the information necessary to put the State on notice in a timely fashion that she would ask for a recount of the entire State.

### 3.    Michigan's voters and taxpayers are prejudiced by Stein's inexcusable delay.

Stein's unjustified delay in challenging Michigan's election machinery, and then in bringing her recount petition, has caused

Michigan taxpayers prejudice by dramatically increasing the cost required to address Stein's concerns. *Pub Health Dep't*, 452 Mich at 507. As discussed in more detail above, had Stein raised her objections *before* the election, the State could have implemented audit procedures that Stein's own experts describe as very reliable in determining "the correctness of the election outcome," Ex. 9, ¶ 15 (Affidavit of Dan Wallach), Ex. 14 (Affidavit of Poorvi Vora), ¶ 29; Ex. 15 (Affidavit of Ronald Rivest), ¶ 23; and, importantly, her experts describe these audit procedures as "quite cheap," Ex. 15 (Rivest Affidavit), ¶ 23. But by delaying her claims, Stein instead threatens to foist upon Michigan taxpayers a completely unnecessary bill for $5 million (at the very least).

The Attorney General also notes that Stein has dropped her recount action in the Pennsylvania state courts and plans instead to seek federal court intervention. Her reason for dropping the state action? Despite having raised *millions of dollars* in donations, Stein was inexplicably unable to post just a *$1 million* bond that the Pennsylvania court required to support her recount effort, telling the court that she "cannot afford" it. Emma Bowman & Colin Dwyer, *Jill*

16

*Stein Campaign Plans to Take Pennsylvania Recount Effort to Federal Court*, NPR (Dec. 3, 2016), available at http://www.npr.org/ sections/the two-way/2016/12/03/504285672/jill-stein-campaign-drops-her-recount-effort-in-pennsylvania (last visited Dec. 4, 2016).  This is direct evidence that Stein has no intention of paying the enormous cost of her recounts with her own money, as she has suggested in the media, and instead plans to stick hardworking taxpayers with the bill.  It is *Michigan taxpayers*, not Stein's donors, who will be on the hook to pay the cost of the recount, which has been estimated to cost $5 million or more.  See Chad Livengood, *Mich. recount to start Friday barring Trump challenge*, The Detroit News (Dec. 1, 2016), available at http://www.detroitnews.com/story/news/ politics/2016/11/30/ recount/94667998/ (last visited Dec. 1, 2016).  While Stein has argued that the benefits of a recount are "priceless," her refusal to put money forward for the Pennsylvania effort confirms that she only believes the effort is "priceless" when *spending other people's money*.

Stein's delay also threatens to prejudice Michigan voters by putting Michigan's votes in the federal electoral system at risk.  Title 3, Section 5 provides a "safe harbor" that guarantees the counting of a

State's electoral votes *if* any "controversy or contest" regarding those electors is resolved "at least six days before the time fixed for the meeting of electors." *Id.*; *Bush v Palm Beach Cty Canvassing Bd*, 531 US 70, 77–78 (2000). Because 3 USC 7 fixes the meeting of electors this year for December 19, 2016, Michigan must resolve any "controversy or contest" regarding its electors "at least six days before" that date, i.e., by December 13, 2016, to guarantee the counting of its electoral votes under this safe harbor. *Bush v Gore*, 531 US 98, 110 (2000) (noting that "[3 USC 5] requires that any controversy or contest that is designed to lead to a conclusive selection of electors be completed by" the safe harbor date).

If Michigan *does not* resolve a dispute as to its electors by the "safe harbor" date, Michigan's electoral votes are potentially vulnerable to objection once Congress convenes on January 6, 2017 to count the states' electoral votes. That is because the President of the Senate, who presides over the session, "shall call for objections" upon reading aloud "the certificates and papers purporting to be certificates of the electoral votes." 3 USC 15. If there is an objection to Michigan's electoral return,

18

the State's return must be counted if it was "regularly given" by electors whose appointment has been "lawfully certified" under 3 USC 6.

But if the House and Senate agree that the State's return was not "regularly given"—a term that is undefined—the State's electoral return is at risk of being rejected.  3 USC 15.  And if Michigan submits more than one electoral return (say, an initial return, and a second return following a partial recount), Congress is directed to honor votes that have been "regularly given" by electors appointed consistently with the safe harbor provision, 3 USC 5.  3 USC 15.  And if two State authorities dispute the electors to be certified, or if the State submits multiple returns and has not resolved a conflict by the safe harbor date, then Michigan is at risk of having its electors finally determined (and possibly completely rejected) not by the State, but by a federal body— the U.S. House and Senate.  3 USC 15.

This means that any recount results—and indeed any controversy or contest over the appointment of Michigan's electors—*must* be resolved and certified to the federal government before the safe harbor date of December 13, 2016, for Michigan to comply with the Legislature's directive that Michigan's electors take part in the federal

19

electoral process. *Bush v Gore*, 531 US 98, 110 (2000). Stein's last-minute recount efforts threaten Michigan's ability to meet the safe-harbor deadline, given her choice to delay requesting a recount until three weeks after the election and less than two weeks before the federal deadline.

### C.    Abstention is required under *Burford*.

The Supreme Court has explained that "*Burford* abstention is appropriate where timely and adequate state-court review is available and (1) a case presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the case at bar,' or (2) the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989)).

Those circumstances are satisfied here. The United States Constitution gives a state legislature plenary authority to dictate the manner in which the state's electors are appointed. U.S. Const., art. II,

§ 1, cl. 2; *Bush v. Gore*, 531 U.S. 98, 104 (2000) (explaining that "the state legislature's power to select the manner for appointing electors is plenary . . . ."). Michigan's Legislature has exercised that authority to pass reasonable laws governing the election process, including who is entitled to a recount, and what period of time should be allotted to the courts to review a recount decision by the Board of State Canvassers. These questions are of substantial public importance, and the district court's order—particularly if it is interpreted to retain jurisdiction over the entire state recount—is disruptive of Michigan's efforts to establish a coherent policy with respect to these issues.

### D.    Michigan Compiled Laws 168.882(3) is constitutional.

For the reasons stated by the Defendants Christopher Thomas and the Board of State Canvassers, (Dist. Ct. 2:16-cv-14233, R.6, Page ID #519), Michigan Compiled Laws 168.882(3)—which provides a two-day waiting period following the Board of State Canvassers' resolution of objections to a recount petition—is constitutional.

### E.    Plaintiffs' are not constitutionally entitled to a recount.

Plaintiffs believe that Michigan taxpayers are constitutionally obligated to fund and conduct an exorbitantly expensive statewide manual recount because a candidate who received *1.07% of the vote* has raised the specter that, in theory, Michigan's voting machines could be hacked.  If Plaintiffs are right, it is *always* unconstitutional *not* to conduct a recount for every election, for every office, and in every state, where there is any remote, theoretical possibility of hacking despite a total lack of evidence.  See, e.g., Ex. 15 (Affidavit of Ronald Rivest), ¶ 33 ("I should emphasize that I have no particular evidence of manipulation or tampering of the ballots or the results of the 2016 U.S. Presidential election.).  The claim is absurd on its face.

Michigan's statute governing eligibility and petitioning for a recount, Mich. Comp. Laws 168.879, is constitutional.  Statutes duly enacted by state legislatures are presumed constitutional, and no Michigan voter has been disenfranchised by Michigan's election law. The Board of Canvassers has canvassed and certified the voting results, the Governor has certified Michigan's electors to the United States Secretary of State, and the electors will meet on December 19, 2016 to

cast their votes in the Electoral College.  (Dist. Ct. 2:16-cv-14233, R.6, Page ID #520).

Instead, it is Stein's last-minute push for a rushed state-wide recount that presents the potential for disenfranchisement, where even a spokesman for the Secretary of State has stated publicly that the State lacks the elections officials to supervise the recounts at the county level.  See Joe LaFurgey, *Vote recount ordered by Jill Stein likely to cost MI taxpayers*, Wood TV (Nov. 28, 2016), available at http://woodtv.com/2016/11/28/vote-recount-ordered-by-jill-stein-likely-to-cost-mi-taxpayers/ (last visited Nov. 30, 2016) (noting that the Bureau of Elections does not have enough employees even to send one employee per county).  A claim as serious as Plaintiffs' that a recount is constitutionally required in such a situation—a proposition that is not free of its *own* potential for disenfranchisement—deserves more consideration than the present TRO request permits.

## II.   The People of the State of Michigan will be irreparably harmed absent a stay.

The People of the State of Michigan will be irreparably harmed absent a stay for several reasons.  First, to the extent the district court's

order may be interpreted as retaining continuing jurisdiction and supervisory power over the state recount process, the Michigan state courts will be thwarted in their ability to do their jobs—interpret Michigan law.

Moreover, as the Chief Justice of the Supreme Court has stated, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (internal quotation omitted).

The People will also be harmed for the reasons stated above in the Attorney General's discussion of laches—namely:  (1) it is Michigan taxpayers who will have to shoulder the immense cost of a recount by a candidate who received 1% of the vote, and (2) Stein's delay in raising her claims puts Michigan at risk of missing the federal safe harbor deadline for resolving disputes about its electors.

## III.  Plaintiffs will not suffer irreparable harm if a stay is granted.

Plaintiffs will suffer no irreparable harm if this Court enters a stay.  Aside from the fact that Stein and her several experts have cited

no evidence of wrongdoing in Michigan's vote-counting process, see, e.g., Ex. 15 (Affidavit of Ronald Rivest), ¶ 33 ("I should emphasize that I have no particular evidence of manipulation or tampering of the ballots or the results of the 2016 U.S. Presidential election."), Stein has no possible chance of winning in a recount. Stein received approximately 1.07% (51,463 votes) of the total votes cast for President in Michigan (approaching 5 million votes), and over 2.2 million votes separate her from the number of votes received by the winner, candidate Donald Trump. Certified 2016 Presidential Election Results, available at http://www.michigan.gov/sos/0,4670,7-127-1633_8722-397762--,00.html (last visited Nov. 30, 2016). She has admitted in state court that she is "unlikely to win Michigan's electoral votes in a recount." (See Ex. 1, p 13, ¶ 16.) Accordingly, she and her supporters will suffer no loss or injury if the recount does not go forward.

## IV.   The public interest in a stay is strong.

The public interest in a stay is strong. At stake is: (1) the enormous cost of a last-minute, state-wide recount, to be borne in large part by Michigan taxpayers; (2) Michigan's ability to guarantee selection of its electors in the federal electoral system; and (3) the

ability of state courts to decide important questions of state law that affect all elections.

## CONCLUSION AND RELIEF REQUESTED

For these reasons, this Court should issue an immediate stay of the district court's temporary restraining order pending the resolution of this appeal. The Attorney General asks this Court to rule on this emergency motion for a stay no later than 5:00 p.m. Tuesday, December 6, 2016, so that the Michigan Court of Appeals may rule following its scheduled hearing in this matter at 4:00 p.m. Tuesday, December 6, 2016. In the event this panel is inclined to deny the Attorney General's motion for stay, he requests that the panel, on its own motion, refer this case for an initial hearing en banc.

Respectfully submitted,

Bill Schuette
Michigan Attorney General

*/s/ Matthew Schneider*
Matthew Schneider (P62190)
Chief Legal Counsel
Counsel of Record

John J. Bursch (P57679)
Special Assistant Attorney
General

BURSCH LAW PLLC
9339 Cherry Valley Ave SE, #78
Caledonia, MI 49316
(616) 450-4235

Kathryn M. Dalzell (P78648)
Assistant Solicitor General
Attorneys for Plaintiff
P.O. Box 30212
Lansing, MI 48909
(517) 373-1124

Dated:  December 6, 2016

## CERTIFICATE OF SERVICE

I certify that on December 6, 2016, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

*/s/ Matthew Schneider*
Matthew Schneider (P62190)
Chief Legal Counsel
Counsel of Record
Attorneys for Plaintiff
P.O. Box 30212
Lansing, MI 48909
(517) 373-1124

28